**Rusing Lopez & Lizardi, PLLC**
6363 N. Swan Road, Suite 151
Tucson, AZ 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262

Jonathan M. Saffer
jsaffer@rllaz.com
State Bar No. 275205
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Main Street Senior Living, LLC, an Arizona limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Everest Oceanside Acquisition Holding LLC, a Delaware limited liability company; Everest Oceanside Blessing Star, LLC, a California limited liability company; Everest Senior Living, LLC, a Delaware limited liability company; Edward Pan and Doe Pan, husband and spouse; Eric Lao and Doe Lao, husband and spouse; Charlene Lee and Doe Lee, wife and spouse; James Chan and Doe Chan, husband and spouse; and Ferlina McBride and Doe McBride, wife and spouse,<br><br>Defendants. | Case No.: 2:24-cv-402<br><br>**COMPLAINT** |

Plaintiff Main Street Senior Living, LLC, an Arizona limited liability company, alleges as follows:

## PARTIES, VENUE, AND JURISDICTION

1. Plaintiff Main Street Senior Living, LLC ("Main Street" or "Plaintiff") is a limited liability company organized under the laws of the State of Arizona.

2. Defendant Everest Oceanside Acquisition Holding, LLC ("Everest Holding" or "Defendant") is a limited liability company organized under the laws of the State of Delaware.

3. Defendant Everest Oceanside Blessing Star, LLC ("Everest Blessing" or "Defendant") is a limited liability company organized under the laws of the State of California.

4. Defendant Everest Senior Living, LLC ("Everest Senior Living") is a limited liability company organized under the laws of the State of Delaware, formerly named Pacific Partners Senior Living.

5. Everest Holding, Everest Blessing, and Everest Senior Living are vicariously liable for the acts and omissions of its employees and agents as alleged herein.

6. Defendant Eric Lao ("Lao") is, and at all times relevant hereto was, a resident of Los Angeles County, California. Eric Lao and Doe Lao (together, the "Laos") are husband and spouse and residents of Los Angeles County, California. At all relevant times hereto, each of the Laos acted for the benefit of and on behalf of their marital community.

7. Defendant Edward Pan ("Pan") is, and at all times relevant hereto was, a resident of Los Angeles County, California. Edward Pan and Doe Pan (together, the "Pans") are husband and spouse and residents of Los Angeles County, California. At all relevant times hereto, each of the Pans acted for the benefit of and on behalf of their marital community.

8. Defendant Charlene Lee ("Lee") is, and at all times relevant hereto was, a resident of Los Angeles County, California. Charlene Lee and Doe Lee (together, the "Lees") are wife and spouse and residents of Los Angeles County, California. At all relevant times hereto, each of the Lees acted for the benefit of and on behalf of their marital community.

9. Defendant James Chan ("Chan") is, and at all times relevant hereto was, a resident of Orange County, California. James Chan and Doe Chan (together, the "Chans") are husband and spouse and residents of Los Angeles County, California. At all relevant times hereto, each of the Chans acted for the benefit of and on behalf of their marital community.

10. Defendant Ferlina McBride ("McBride") is, and at all times relevant hereto was, a resident of San Diego County, California and owns property in Orange County, California. Ferlina McBride and Doe McBride (together, the "McBrides") are wife and spouse and residents of Los Angeles County, California. At all relevant times hereto, each of the McBrides acted for the benefit of and on behalf of their marital community.

11. Everest Blessing, Everest Oceanside, Everest Senior Living, Lao, Pan, Lee, and Chan (together, "Everest Defendants"), and Defendant McBride have caused events to occur in California and have damaged Plaintiff as alleged herein.

12. Personal jurisdiction is proper in this Court. All Defendants, except Everest Holding, are all domiciled in Los Angeles County, California.

13. Jurisdiction is proper in the Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a). Plaintiff's primary causes of action arise under 18 U.S.C. § 1836 *et seq*. The remainder of Plaintiff's claims relate to the same case or controversy, making exercise of supplemental jurisdiction proper under 28 U.S.C. § 1367.

14. Jurisdiction is also proper in this Court pursuant to 28 U.S.C. §1332. The amount in controversy exceeds $75,000.00 and the parties are diverse. Plaintiff is a citizen of Arizona, and all Defendants are citizens of either California or Delaware.

15. Venue is proper in this court pursuant to 28 U.S.C. § 1391.

16. All acts complained of herein which give rise to Plaintiff's claims against Defendants occurred, in whole or in part, in Los Angeles County, California.

## GENERAL ALLEGATIONS

17. Main Street manages and operates senior care facilities that specialize in retirement, assisted living, and memory care that creates value for residents, families, and employees of the communities it manages.

18. Main Street is the licensed Manager on record of the Oceanside community, licensed through the California Department of Social Services.

19. Main Street operates as the manager of the Oceanside community and is licensed pursuant to Health & Saf. Code, § 1569.10.

20. Main Street is beneficially owned by Kendall Jamison and managed by Kendall and Preston Jamison, who are father and son respectively.

21. Upon information and belief, the Everest Defendants is a real estate investment and fund management company with a focus acquiring senior housing communities.[1]

22. Upon information and belief, on October 24, 2022, the Everest Defendants entered into an agreement to purchase the senior housing real estate property known as Merrill Gardens Truewood Oceanside located at 3500 Lake Boulevard, Oceanside, CA 92056, from the seller MG at Oceanside, LP now known as Everest at Oceanside (the "Everest Property".)

23. Upon information and belief, upon the close of the transaction, Merrill Gardens remained as the licensed Manager on record with the California Department of Social Services for the Oceanside community for the period of October 25, 2022, until March 1, 2023, contracted with Everest to manage the community through a bridge Management Agreement.

24. Upon information and belief, the Everest Defendants are not licensed under Health & Saf. Code, § 1569.10.

---

[1] *See* Everest Senior Living website: https://everestseniorliving.com/.

25. The residents of the Everest Property are California Residents.

26. Main Street is bound by the Confidential Medical Information Act.

27. Main Street is a covered entity as defined in 45 CFR §160.103.

28. Everest Defendants are not acting as covered entities as defined in 45 CFR §160.103.

29. Everest Defendants are not acting as business associates of Main Street, as defined in 45 CFR 160.103.

30. Main Street has not entered into a business associate agreement ("BAA") with Everest Defendants.

31. Main Street's management software, Aline software, contains Patient Health Information including Protected Health Information ("PHI") as defined in the Health Information Portability and Accountability Act (HIPAA).

32. The data contained in Main Street's Aline software contains consumer data ("Consumer Data") is regulated by the California Consumer Privacy Act of 2018 and California Privacy Rights Act of 2020.

33. Upon information and belief, Everest Defendants do not require access to PHI or Consumer Data in order for care to be provided to patients.

**Main Street takes over Management of the Everest Property pursuant to Management Agreement**

34. Shortly after the Everest Defendants purchased the Everest Property, Main Street and Everest Senior Living entered into a Management Agreement dated December 19, 2022, (the "Management Agreement") whereby Main Street agreed to manage and operate the residential care facility, the Everest Property.

35. On March 1, 2023, after licensing approval from the California Department of Social Services, Main Street took over management of the Everest Property.

36. Upon taking over Management on March 1, 2023, Main Street immediately began putting in place its **proprietary** operational policies, procedures, and processes to include all required documentation according to State regulations for the Residential Care

Facilities for the Elderly (RCFE), Main Street staffing and departmental expense processes and guidelines, employee medical and health benefits programs, payroll systems, resident services processes, replaced all department manager positions, filled open line staffing positions, etc. ("Trade Secrets").

37. On November 7, 2023, Mr. Trevor W. Martin, counsel for Everest Defendants, sent an e-mail to Kendall Jamison, requesting certain financial information including: "(1) all financial statements for Oceanside from January 1, 2022 through September 30, 2023, (2) all resident rosters or rent rolls from January 1, 2022 through September 30, 2023, (3) all bank statements for the Oceanside Community from January 1, 2022 through September 30, 2023, (4) all credit card statements for the Oceanside Community from January 1, 2022 through September 30, 2023, and (5) the 2022 federal and state tax return for the Oceanside Community."

38. On November 9, 2023, Kendall Jamison of Main Street responded to Mr. Martin and informed him that a different unrelated entity, Merrill Gardens, remained the manager of the Community until March 1, 2023, and that Main Street would not have financial information prior to that date. Mr. Jamison then attached to his e-mail all of the financial documents for the period March 1, 2023 (the date Main Street took over management) to September 2023, including four zip files and a pdf file entitled "Sample Community Financial Package" which contained links to various reports for the Community which he informed you would be updated and provided to Everest monthly. Everest representatives "Edward <Pan>," "Eric <Lao>" and "James <Chan>" are each copied on Mr. Jamison's November 9, 2023, response e-mail.

39. On November 15, 2023, Kendall Jamison emailed audited Income Statements and Balance Sheets to Everest representatives Pan, Lao, and James Chan.

**<u>The Everest Defendants and Representatives Engage in significant Misconduct by wrongfully interrogating Main Street Employees in violation of the Management Agreement.</u>**

40. Section 401.1 of the Management Agreement states that all staff and personnel employed at the Community are "hired by the Managing Company to perform Managing Company's duties under this Agreement" and that "the employees of the Management Company (whether on site or off site of the Community) shall be employees of the Management Company and shall not be employees of the Owner."

41. Section 501.9 of the Management Agreement provides that "The Management Company shall permit the Owner to conduct on-site evaluations of the performance of any or all management services," provided that "an authorized representative of the Management company shall be available during on-site evaluations."

42. On October 31, 2023, at 5:37 p.m., Everest Representative James Chan requested that Main Street's Kendall Jamison provide copies of the July and August balance sheets for the Community.

43. Later that evening at 8:22 p.m., Everest representative Eric Lao e-mailed Main Street's Kendall Jamison informing him that he would "come by" the Oceanside Community "tomorrow" and visit with the business officer to get the "missing" balance sheets from July and August that Mr. Chan had requested. *Id.*

44. Mr. Jamison responded at 9:27 pm and informed Mr. Lao that, while he would gladly meet him at the property, he needed to first obtain the balance sheets from Michael on the accounting team.

45. The next morning Mr. Jamison arrived at the Community and learned that Everest representatives Eric Lao, Edward Pan, James Chan, and Charlene Lee had already entered onto the property and that the Everest Representatives had proceeded behind closed doors to interrogate Main Street employee Sylvia Spears (Oceanside's Business Office Director) regarding financial matters without allowing her direct supervisor, Ferlina McBride, Executive Director, to be present.

46. Mr. Jamison later learned Everest representatives engaged in private interviews with Oceanside residents.

47. On November 2, 2023, Mr. Jamison sent an email informing Lao, Chan, and Pan that their visit to the Oceanside property and their conduct on-site had shaken both residents and Main Street staff alike.

48. Upon information and belief, the Everest Representatives stated the purpose for their visit – to obtain the July and August balance sheets – appears to be entirely pretextual as they had already been informed, they could not be obtained at the property.

49. Everest representatives' conduct interfered with Main Street's management and caused reputational and financial damage for which Everest remains liable at law and under the Management Agreement.

**The Everest Defendants and Representatives Engage in Significant Misconduct By Wrongfully Demanding Access to Main Street's Proprietary Information in Order to Develop Competing Software In Violation of The Management Agreement.**

50. In discharging its duties under the Management Agreement, Main Street entered into the Master Software and Services Agreement with Glennis Solutions, LLC, formerly known as Glennis, now known as Aline ("Aline"), dated February 28, 2023, ("Aline Agreement").

51. The Aline Agreement provides that Main Street, as the licensed manager and sole customer of Aline, agrees to take reasonable precautions to protect the Software Services from unauthorized access and shall maintain the confidentiality of its Access Codes.

52. The Aline Agreement further states that it is the obligation and duty of Main Street to prevent access to any unauthorized users.

53. The Everest Defendants are not authorized users under the agreement, and thus Main Street has a duty to prohibit access to the platform.

54. In late November 2023, Everest representative Edward Pan informed Main Street that Everest would be working with a Taiwanese based IT and Healthcare company, U-Ark, to develop its own software program tailored to assisted living facilities.

55. In furtherance of this effort, Mr. Pan requested that Main Street representative Kendall Jamison provide him with a Username and Password so that he and Everest representative Eric Lao could log in and access Main Street's management software known as Aline, which was licensed exclusively to Main Street by software developer Aline.

56. Mr. Jamison informed Mr. Pan that allowing third party access to the software could violate Main Street's license agreement with Aline and offered instead to arrange for Aline representatives to perform a demonstration of the software.

57. Lao declined this offer and persisted in his request for Mr. Jamison to provide him direct access to the Aline software.

58. Section 1201.6 of the Management Agreement titled "Ownership of Policies and Procedures" expressly provides that "[t][he systems, methods, procedures, controls, forms, procedural manuals, and written information employed by the Management Company in the management, operation and marketing of the Community are and shall be the exclusive property of the Management Company and shall not be used, distributed, copied, or otherwise employed or acquired by Owner, except as may be authorized in advance and in writing by Management Company." Such systems, methods, and procedures include proprietary software utilized by Main Street to manage and operate the Community.

59. By an e-mail dated November 20, 2023, Mr. Jamison again declined to provide the Username and Password stating that the Aline software contains residents' confidential medical and financial information that could not be shared with Everest or U-Ark and informing them that, as a Health Care Provider, Main Street is bound by Federal HIPAA law and regulations to safeguard and protect resident medical and healthcare information.

60. As Manager, it is the responsibility of Main Street Senior Living, LLC to protect and to reduce all potential risks of liability to Everest Senior Living and to Main Street Senior Living, and therefore cannot provide access to Resident's medical and personal information to any individual(s) and/or company(s) outside of our organization.

**The Everest Defendants and Representatives Retaliate by bombarding Main Street with Excessive and Duplicative Emails and Requests for Information.**

61. Following Mr. Jamison's refusal to provide direct access to the Aline software, and in apparent retaliation therefore, Everest representatives issued approximately 20 separate e-mails requesting information from Main Street over a 48-hour period, many of these requests sought information that had already been provided directly to Everest representatives and had been provided to Mr. Martin as part of Mr. Jamison's November 7, 2023, e-mail response.

62. Among this inundation of emails, many were sent outside normal business hours, some as late as 3:45 a.m.

63. On December 7, 2023, Mr. Jamison e-mailed Everest representative Eric Lao requesting that Everest cease this unprofessional behavior but committed to responding to the e-mails as soon as possible.

64. On December 8, 2023, Main Street received a Notice of Default from Mr. Martin as counsel for Everest, alleging *inter alia*, Main Street has failed to timely provide updated financial information and demanding access to Main Street bookkeeping and other systems.

**The Everest Defendants and Representative Conspire with Then Main Street Employee, McBride, to Illegally Download Main Street's Proprietary Information and Give The Everest Defendants Unauthorized Access to Main Street's Proprietary Software.**

65. Main Street employed Ferlina McBride as a licensed Executive Director.

66. Main Street requires its employees to sign agreements that state:

> Each employee is responsible for safeguarding confidential information obtained during employment. In the course of your work, you may have access to confidential information regarding Main Street Senior Living and Everest at Oceanside, its suppliers, its residents, or perhaps even fellow employees. It is your responsibility to in no way reveal or divulge any such information unless it is necessary for you to do so in the performance of your duties. At no time are employees of Main Street to share Residential medical and/or financial information, log-in usernames and/or passwords to provide access to Aline or access to any other Main Street Senior Living, LLC proprietary information to any individual, company, or organization that is not a direct employee of Main Street Senior Living, LLC and without written approval from the Main Street Senior Living corporate office. Access to confidential information should be on a "need-to-know" basis and must be authorized by your immediate supervisor and Main Street Senior Living corporate office. Any breach of this policy will not be tolerated and may lead to disciplinary action up to, and including, termination and/or legal action taken by Main Street Senior Living, LLC and/or Everest at Oceanside.

67. On November 20, 2023, McBride signed the above updated Confidentiality policy. *See* attached Signed Confidentiality Agreement dated November 20, 2023.

68. Upon information and belief, Everest Representatives began to communicate with Main Street employees at the Oceanside property, via Charlene Lee.

69. Upon information and belief, one of the employees that Everest Representatives talked to is Ms. McBride.

70. Upon information and belief, Everest Representatives provided McBride with an email address to use with the Everest domain name and used this to communicate with her, email address is ferlina@everestseniorliving.com.

71. Preston Jamison discovered the email address on Ms. McBride's computer issued laptop after she was terminated and sent an email to the address, to which he received a response.

72. Upon information and belief, the Ferlina McBride Everest email is being actively monitored and used.

73. Upon information and belief, McBride exceeded her authority to access Main Street's software and other proprietary documents and downloaded said information.

74. Upon information and belief, McBride provided Main Street's proprietary documents and resident personal financial and medical information to Everest, downloaded from Main Street's contracted software platform Aline.

75. Upon information and belief, McBride provided her Main Street username and password for Aline to Everest.

76. On January 10, 2024, Aline notified Main Street of suspicious log-in activity and downloaded information from McBride's username, as well as dates and times stating that Ms. McBride's log-in credentials were being used from 5 different IP addresses at the same time.

77. On January 11, 2024, McBride provided Main Street with her two weeks' notice and termination of employment.

78. McBride is no longer an employee of Main Street.

79. Upon information and belief, Everest Representatives used Ms. McBride's log-in credentials to access the Aline software, without consent or authorization of Main Street.

80. Main Street engaged its IT team, StarSource IT Consulting, to extract all data from McBride's Main Street laptop to investigate further breach of confidentiality and communication with Everest.

81. StarSource IT Consulting performed a forensic imaging of Ms. McBride's Main Street laptop and conducted an investigation of said image.

82. StarSource IT Consulting discovered multiple incidents where Ms. McBride downloaded Main Street's proprietary information and documents, including logging into the Main Street Sharefile and downloading proprietary operational policies, procedures, and processes to include all required documentation according to State regulations for the Residential Care Facilities for the Elderly (RCFE), Main Street staffing and departmental expense processes and guidelines, employee medical and health benefits programs, payroll systems, resident services processes, replaced all department manager positions, and filled open line staffing positions documents to her laptop's hard drive.

83. StarSource IT Consulting also uncovered multiple incidents where Ms. McBride used her Main Street email account to email the contents mentioned in ¶ 80 to her personal email address ferlinamcbride@gmail.com with annotations suggesting it was for third-party use.

84. StarSource IT Consulting further discovered multiple incidents where Ms. McBride logged into the Aline Management Software and downloaded resident's PHI and other personal financial information to her laptop's hard drive, those documents were then forwarded to her personal email address, again with annotations suggesting it was for third-party viewing and use.

85. All Main Street databases, including but not limited to ShareFile and Aline, are cloud-based systems that can be accessed (with proper credentials) from any location, and thus there is no need for an employee to download hard copies of these documents and send to their personal emails.

86. StarSource IT Consulting also discovered several Everest and Pacific Living[2] domain names and email addresses when performing a search of Ms. McBride's computer.

87. McBride was an employee of Main Street and not Everest, and therefore McBride would have no work related need to be in communication with Everest Representatives.

**COUNT I**

**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 *ET. SEQ*. AGAINST EVEREST DEFENDANTS AND THE MCBRIDES.**

88. Plaintiff incorporates the allegations above as though fully stated herein.

89. Main Street uses multiple methods to keep secret its proprietary operational policies, procedures, and processes including but not limited to using non-disclosure and

---

[2] Pacific Partners Senior Living is the former name of Everest Senior Living, and it is believed Everest began using Pacific Partners email address to mask the Everest name.

confidentiality agreements, protecting the information electronically, and limiting access to files and folders containing such information.

90. Main Street has maintained and developed trade secrets that derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure or use.

91. As an Executive Director of Main Street, McBride had access to the secret methods, processes, and techniques of Main Street.

92. Upon information and belief, McBride provided Main Street’s proprietary documents and resident personal financial and medical information to the Everest Defendants, downloaded from Main Street’s contracted software platform Aline, without Main Street’s knowledge or approval before she left Main Street’s employ.

93. Upon information and belief, McBride provided her Main Street username and password for Aline to the Everest Defendants, on behalf of the Everest Defendants.

94. The secret methods, processes, and techniques that underly Aline would be useful to the Everest Defendants and McBride because they have admittedly the Everest Defendants requested that Main Street provide him with a Username and Password so that Everest Defendants and Representatives Lao and Pan could log in and access Aline, which was licensed exclusively to Main Street by software developer Aline, and the Everest Defendants could use this information in the development of its own management software with U-Ark.

95. The secret methods, processes, and techniques that underly Aline qualify for trade secret protection under 18 U.S.C. § 1839(3) because they derive independent economic value from not being generally known and have been the subject of reasonable efforts to maintain secrecy.

96. McBride used improper means under 18 U.S.C. § 1839(6) to acquire this information because she copied Main Street’s proprietary operational policies, procedures,

and processes to her personal device without authorization from authorization from Main Street.

97. McBride misappropriated this information under § 1839(5) because she acquired it through improper means and is believed to have used it for the benefit for the Everest Defendants while under contractual and fiduciary duties to Main Street maintain its secrecy.

98. McBride also misappropriated this information under the doctrine of inevitable disclosure because while continuing to serve as an officer and employee of Main Street, she actively communicated with and is believed to have worked for the Everest Defendants, an entity that provides identical services as Main Street in an identical location.

99. Upon information and belief, the Everest Defendants misappropriated information under §1839(5)(A) because they acquired information from McBride, whom they knew acquired it through improper means.

100. Upon information and belief, the Everest Defendants also misappropriated information under § 1839(5)(B)(i) because they used information acquired by McBride through improper means.

101. Upon information and belief, the Everest Defendants also misappropriated information under § 1839(5)(B)(ii)(III) because they used information acquired by McBride while she was under a duty to Main Street to maintain the trade secret and limit its use.

102. Upon information and belief, the Everest Defendants also misappropriated information under § 1839(5)(B)(ii)(II) because they used information acquired while under a contractual obligation to refrain from so doing.

103. As a direct and proximate result of the Everest Defendants, McBride, Pan, and Lao's misappropriation of the Trade Secrets, Main Street has sustained and continues to sustain losses caused by misappropriation, including but not limited to, losses in profits and revenues, loss of business relations with current customers/contracts, loss of business

relations with future business prospects, and loss of competitive business advantage opportunity and/or expectancy.

104. Upon information and belief, the Everest Defendants, McBride, Pan, and Lao's continued misappropriation of Main Street's Trade Secrets continues to cause damage to Main Street, including but not limited to, loss of profits and revenues, loss of business relations with current customers/contracts, loss of business relations with future business prospects, and loss of competitive business advantage opportunity and/or expectancy.

105. Defendant McBride's misappropriation of Main Street's Trade Secrets was willful and malicious because she (1) was under a fiduciary duty to maintain their secrecy as a member of the corporation, as an officer of the corporation, and as an employee of the corporation; (2) was under a duty to maintain its secrets because she had signed an agreement to do so; (3) concealed from Main Street the extent of her relationship and cooperation with the Everest Defendants, Pan, and Lao during the period in which she misappropriated the secrets; (4) utilized those trade secrets to develop a business organization that directly competed with Main Street while under a fiduciary duty not to divert business opportunities from it; and (5) undertook this conduct knowing that it would harm Main Street and its competitive business advantage in the market.

106. Upon information and belief, the Everest Defendants, Pan, and Lao's misappropriation of Main Street's trade secrets was willful and malicious because they utilized secrets acquired (1) after they had had continually been denied access from Main Street and (2) from McBride, who they knew acquired the trade secrets while she was still working for Main Street and thus knew or reasonably should have known that she was under an obligation not to disclose them.

107. Upon information and belief, all acts by McBride were undertaken as an agent of the Everest Defendants and at the direction of the Everest Defendants.

108. Unless these Defendants are immediately and permanently enjoined from misappropriating Main Street's Trade Secrets, Main Street will continue to suffer

immediate and irreparable harm through loss of valuable goodwill, contracts, clients, prospective clients, prospective leads, prospective business prospects, and competitive business advantage opportunity and/or expectancy.

109. Plaintiff has no adequate remedy at law for disclosure and use of its Trade Secrets because they cease to be protectable once disclosed.

110. Plaintiff has no adequate remedy at law for erosion of its customer base and diversion of its business opportunities that will result from Defendants' use of its proprietary software, Trade Secrets, Confidential Information, and other proprietary information because in the insurance industry, customer loyalty and market share/opportunity once lost is not always recoverable. The monetary value of lost customer goodwill is also impossible to quantify.

111. Plaintiff has no adequate remedy at law for future lost business opportunities because the number and value of these opportunities is impossible to quantify.

112. Main Street is entitled to injunctive relief; an award of damages for losses caused by the misappropriation of Trade Secrets; an award of damages for unjust enrichment; disgorgement of any profits that McBride, the Everest Defendants, Pan, and Lao received in connection with this misappropriation; an award of exemplary damages as provided by 18 U.S.C. § 1836; and an award of attorneys' fees provided by 18 U.S.C. § 1836.

## COUNT II

## MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE CALIFORNIA UNIFORM TRADE SECRET ACT, CIV. CODE, § 3426 AGAINST EVEREST DEFENDANTS AND THE MCBRIDES.

113. Plaintiff incorporates the allegations above as though fully stated herein.

114. The California Uniform Trade Secrets Act ("CUTSA"), prohibits the misappropriation of any "trade secret." The term "trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally

known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

115. Main Street has maintained and developed trade secrets that derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure or use.

116. As Executive Director of Main Street, McBride had access to the secret methods, processes, and techniques that underly Aline.

117. Upon information and belief, McBride copied Aline software and other Main Street business files to her personal storage devices without Main Street's knowledge or approval, both before she left Main Street's employ.

118. The secret methods, processes, and techniques that underly Aline would be useful to the Everest Defendants and McBride because they have admittedly the Everest Defendants requested that Main Street provide him with a Username and Password so that the Everest Defendants Representatives Lao and Pan could log in and access Aline, which was licensed exclusively to Main Street by software developer Aline, and the Everest Defendants could use this information in the development of its own management software with U-Ark.

119. The secret methods, processes, and techniques qualify for trade secret protection under Civ. Code, § 3426.1(d) because they derive independent economic value from not being generally known and have been the subject of reasonable efforts to maintain secrecy.

120. McBride used improper means under Civ. Code, § 3426.1(a) because during the time she copied Main Streets proprietary operational policies, procedures, and processes to her personal device without authorization from authorization from Main Street.

121. McBride also used improper means under Civ. Code, § 3426.1(a) to acquire this information because she copied Aline software and other Main Street business files to her personal storage devices without authorization by Main Street and in direct violation of the Confidentiality Agreement she signed with Main Street.

122. McBride misappropriated this information under Civ. Code § 3426.1(a) and (b)(i-ii) because she acquired it through improper means and is believed to have used it for the benefit for the Everest Defendants while under contractual and fiduciary duties to Main Street maintain its secrecy.

123. McBride also misappropriated this information under the doctrine of inevitable disclosure because while continuing to serve as an officer and employee of Main Street, she actively communicated with and is believed to have worked for the Everest Defendants, an entity that provides identical services as Main Street in an identical location.

124. Upon information and belief Pan and Lao also misappropriated information under Civ. Code § 3426.1(b)(1) and (2)(A) & (B)(i) and (iii) because he used it after having agreed to the terms of a non-disclosure agreement.

125. Upon information and belief, McBride and the Everest Defendants misappropriated information under Civ. Code § 3426.1(b)(1) and (2)(A) & (B)(i) and (iii) because they acquired information from McBride, whom they knew acquired it through improper means and had a duty to keep the information secret and limit its use.

126. As a direct and proximate result of Defendants McBride, the Everest Defendants, Pan and Lao's misappropriation of the Trade Secrets, Main Street has sustained and continues to sustain losses caused by misappropriation, including, but not limited to, loss of profits and revenues, loss of business relations with current customers/contracts, loss of business relations with future business prospects, and loss of competitive business advantage opportunity and/or expectancy.

127. Upon information and belief, Defendants McBride, the Everest Defendants, Pan, and Lao's continued misappropriation of Main Street's Trade Secrets continues to cause damage to Main Street, including but not limited to, loss of profits and revenues, loss

of business relations with current customers/contracts, loss of business relations with future business prospects, and loss of competitive business advantage opportunity and/or expectancy.

128. Defendant McBride's misappropriation of Main Street's trade secrets was willful and malicious because she (1) was under a fiduciary duty to maintain their secrecy as an member of the corporation, as an officer of the corporation, and as an employee of the corporation; (2) was under a duty to maintain its secrets because she had signed a confidentiality agreement to do so; (3) concealed from Main Street her relationship with the Everest Defendants, Pan, and Lao during the period in which she misappropriated the secrets; (4) utilized those trade secrets to develop a business organization that directly competed with Main Street while under a fiduciary duty not to divert business opportunities from it; and (5) undertook this conduct knowing that it would harm Main Street and its competitive business advantage in the market.

129. Upon information and belief the Everest Defendants, Pan, and Lao's misappropriation of Main Street's trade secrets was willful and malicious because they utilized secrets acquired (1) after they had had continually been denied access from Main Street and (2) from McBride, who they knew acquired the trade secrets while she was still working for Main Street and thus knew or reasonably should have known that she was under an obligation not to disclose them.

130. Upon information and belief, all acts by McBride were undertaken as an agent of the Everest Defendants and at the direction of the Everest Defendants.

131. Unless these Defendants are immediately and permanently enjoined from misappropriating Main Street's Trade Secrets, Main Street will continue to suffer immediate and irreparable harm through loss of valuable goodwill, contracts, clients, prospective clients, prospective leads, prospective business prospects, and competitive business advantage opportunity, and/or expectancy.

132. Plaintiff has no adequate remedy at law for disclosure and use of its trade secrets because they cease to be protectable once disclosed.

133. Plaintiff has no adequate remedy at law for erosion of its customer base and diversion of its business opportunities that will result from Defendants' use of its proprietary software protected software, Trade Secrets, Confidential Information, and other proprietary information because in the insurance industry, customer loyalty and market share/opportunity once lost is not always recoverable. The monetary value of lost customer goodwill is also impossible to quantify.

134. Plaintiff has no adequate remedy at law for future loss of business opportunities because the number and value of these opportunities is impossible to quantify.

135. Main Street is entitled to injunctive relief; an award of damages for losses caused by the misappropriation of Trade Secrets; an award of damages for unjust enrichment; disgorgement of any profits that McBride, the Everest Defendants and/or Pan and Lao received in connection with this misappropriation; an award of exemplary damages as provided by Civ. Code, § 3426.3; and an award of attorneys' fees provided by Civ. Code, § 3426.4.

**COUNT III**

**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030, AGAINST EVEREST DEFENDANTS AND THE MCBRIDES.**

136. Plaintiff incorporates the allegations above as though fully stated herein.

137. The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, prohibits the unauthorized access to a company's computer system for purposes of committing fraud.

138. Upon information and belief, on January 10, 2024, the Everest Defendants and McBride intentionally accessed computer systems owned by Main Street.

139. McBride left her employment with Main Street in or around January 11, 2024, the day after Main Street received notification of suspicious log in and downloading activity on McBride's Aline account.

140. McBride's log in and downloading activity was done without authorization from Main Street.

141. Upon information and belief, all acts by McBride were undertaken as an agent of the Everest Defendants and at the direction of the Everest Defendants.

142. The Everest Defendants and McBride obtained information stored on computer systems owned by Main Street on or before December 1, 2023, until January 10, 2024.

143. The computer systems owned by Main Street affect interstate commerce and are thus protected computers under 18 U.S.C. § 1030(e)(2).

144. Main Street has suffered losses/damages well in excess of $5000 as a result of the unauthorized access to and acquisition of information from its computer systems by the Everest Defendants and McBride.

145. Main Street demands compensatory damages for these losses under 18 U.S.C § 1030(g).

**COUNT IV**

**VIOLATION OF COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT, CAL. PENAL CODE § 502, AGAINST EVEREST DEFENDANTS AND THE MCBRIDES.**

146. Plaintiff incorporates the allegations above as though fully stated herein.

147. The Comprehensive Computer Data Access and Fraud Act ("CCDAFA"), Cal. Penal Code § 502, prohibits, *inter alia*, accessing computer systems for purposes of stealing data or committing fraud. Under the CCDAFA a person commits a felony if he: (1) knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data; or (2) knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c).

148. Upon information and belief, on or before January 2, 2024, the Everest Defendants and McBride intentionally accessed computer systems owned by Main Street.

149. McBride left her employment with Main Street in or around January 11, 2024, the day after Main Street received notification of suspicious log in and downloading activity on McBride's Aline account.

150. McBride's log in and downloading activity was done without authorization from Main Street in violation of Pen. Code, § 502(c)(2) and (6-7).

151. Upon information and belief, all acts by McBride were undertaken as an agent of the Everest Defendants and at the direction of the Everest Defendants.

152. The Everest Defendants and McBride obtained information stored on computer systems owned by Main Street on or before December 2023, until January 10, 2024.

153. The computer systems owned by Main Street affect interstate commerce and are thus protected computers under 18 U.S.C. § 1030(e)(2).

154. Main Street has suffered losses/damages well in excess of $5,000 as a result of the unauthorized access to and acquisition of information from its computer systems by the Everest Defendants and McBride.

155. Main Street demands compensatory damages for these losses suffered as a result of McBride and the Everest Defendants violations of CCGAFA, along with attorney's fees, to be determined at trial.

156. Main Street further seeks an injunction requiring the Everest Defendants and McBride to disclose all materials stolen from Main Street's systems or derived from stolen materials, to return those materials to Main Street, and to cease their use of those materials. Additionally, because McBride and the Everest Defendants violations of the CCDAFA were willful, and McBride and the Everest Defendants acted with oppression, fraud, and malice, Main Street seeks punitive damages to be determined at trial.

**<u>COUNT V</u>**

**<u>TORTIOUS INTERFERENCE WITH CONTRACTS/BUSINESS EXPECTANCIES AGAINST THE EVEREST DEFENDANTS</u>**

157. Plaintiff incorporates the allegations above as though fully stated herein.

158. Main Street and Aline executed the Master Software and Services Agreement, which created a valid contractual relationship between them.

159. Upon information and belief, the Everest Defendants knew Main Street and Aline had a contractual relationship.

160. The Everest Defendants intentionally interfered with Main Street's contractual relationships with Aline by attempting to cause Main Street to breach its obligation to Aline to restrict third party access to the software and directing McBride to give the Everest Defendant's unauthorized access to the software.

161. In doing so, the Everest Defendants acted improperly.

162. As a direct and proximate result of the Everest Defendant's tortious interference with those contractual relationships and business expectancies, Main Street has incurred and continues to incur damages, including but not limited to lost business and other financial benefits, and potential loss of future utilization of Aline management software in communities, among other things.

163. The Everest Defendants acted with the intent to injure, defraud, and/or deliberately interfere with the rights of Main Street.

164. Upon information and belief, all acts by McBride were undertaken as an agent of the Everest Defendants and at the direction of the Everest Defendants.

165. Main Street is entitled to an award for its damages, punitive damages, and/or disgorgement of profits. Damages include but not limited to, loss of profits and revenues, loss of business relations with current customers/contracts, loss of business relations with future business prospects, loss of competitive business advantage opportunity and/or expectancy, loss of goodwill, and cost of computer forensic analysis.

**COUNT VI**

**CONVERSION AGAINST ALL DEFENDANTS**

166. Plaintiff incorporates the allegations above as though fully stated herein.

167. The Everest Defendants and McBride intentionally exercised domain or control over Main Street's chattel, including electronic files, folders, and other proprietary information.

168. Upon information and belief, all acts by McBride were undertaken as an agent of the Everest Defendants and at the direction of the Everest Defendants.

169. As a result of the Everest Defendants and McBride's exertion of dominion or control over Main Street's files, folders, copyright protected code, Trade Secrets, Confidential Information, proprietary information, and chattel, they seriously interfered with Main Street's right to control such electronic files, folders, and other proprietary information and chattel.

170. As a result of the Everest Defendants and McBride's conduct, Main Street has incurred and continues to incur damages, including but not limited to, loss of profits and revenues, loss of business relations with current customers/contracts, loss of business relations with future business prospects, loss of competitive business advantage opportunity and/or expectancy, loss of goodwill, and cost of computer forensic analysis.

171. Main Street is entitled to an award of damages against the Everest Defendants and McBride.

**COUNT VII**

**CIVIL CONSPIRACY AGAINST ALL DEFENDANTS**

172. Plaintiff incorporates the allegations above as though fully stated herein.

173. Upon information and belief, the Everest Defendants and McBride conspired to have McBride log into Main Street databases without authorization, and copy Main Street's proprietary information, including all required documentation according to State regulations for the Residential Care Facilities for the Elderly (RCFE), Main Street staffing

and departmental expense processes and guidelines, employee medical and health benefits programs, payroll systems, resident services processes, replaced all department manager positions, filled open line staffing positions, etc., and sent it to the Everest Defendants.

174. Upon information and belief, the Everest Defendants and McBride agreed and conspired to misappropriate and use Main Street's Trade Secrets, Confidential Information, and other proprietary information, including but not limited Main Street's **proprietary** operational policies, procedures, and processes to include all required documentation according to State regulations for the Residential Care Facilities for the Elderly (RCFE), Main Street staffing and departmental expense processes and guidelines, employee medical and health benefits programs, payroll systems, resident services processes, replaced all department manager positions, Resident's PHI and other financial information, and filled open line staffing positions.

175. In furtherance of that agreement, McBride affirmatively misappropriated Main Street's Trade Secrets, Confidential Information, and other proprietary information by, among other things, covertly downloading files, passwords, and folders containing such from Main Street's database prior to leaving Main Street.

176. In furtherance of that agreement, McBride affirmatively provided such Trade Secrets, Confidential Information, and other proprietary information to the Everest Defendants using an email provided to her by the Everest Defendants with an Everest domain.

177. Upon information and belief, all acts by McBride were undertaken as an agent of the Everest Defendants and at the direction of the Everest Defendants.

178. Upon information and belief, the idea for this agreement was discussed in part during an unauthorized, closed-door meeting where Everest Defendants directed McBride to do so.

179. As a direct and proximate result of the Everest Defendants and McBride agreements and conduct, Main Street has incurred and continues to incur damages, including but not limited to, loss of profits and revenues, loss of business relations with

current customers/contracts, loss of business relations with future business prospects, loss of competitive business advantage opportunity and/or expectancy, and cost of computer forensic analysis.

180. Main Street is entitled to an award of damages and punitive damages against the Everest Defendants and McBride.

**COUNT VII**

**UNFAIR COMPETITION AGAINST ALL DEFENDANTS.**

181. Plaintiff incorporates the allegations above, except those related to Trade Secret claims ¶¶ 88 - 135, as though fully stated herein.

182. To the extent any of the Trade Secrets do not fall within a trade-secrets claim under the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq*.) or California's Uniform Trade Secret Act (Civ. Code § 3426 *et seq*.), then such information is secret, proprietary information.

183. California Business and Professions Code Section 17200 *et seq*., the Unfair Competition Law ("UCL"), prohibits unfair competition, which includes any unlawful, unfair and/or fraudulent acts or practices and any unfair, deceptive, untrue, or misleading advertising.

184. Main Street invested substantial time, effort, and money in developing its processes and procedures including in all required documentation according to State regulations for the Residential Care Facilities for the Elderly (RCFE), Main Street staffing and departmental expense processes and guidelines, employee medical and health benefits programs, payroll systems, resident services processes, replaced all department manager positions, filled open line staffing positions, etc.

185. In November 2023, the Everest Defendants began demanding log in and password information for Main Steet's management database, Aline, which Main Street refused to give because the database contained Main Streets proprietary information and patient's personal medical and financial information.

186. Also in November, the Everest Defendants entered the Oceanside Property, exceeding its authority to do so, and met with Main Street employees without Main Street's authorization.

187. Upon information and belief, the Everest Defendants began communications with Main Street Executive Director, McBride.

188. Upon information and belief, the Everest Defendants made false representations to Main Street employees, including McBride, in an attempt to gain access to Main Street's Management Software.

189. Upon information and belief, McBride covertly downloaded files and folders containing secret, proprietary information from Main Street's systems at the direction of the Everest Defendants.

190. McBride took and still possesses Main Street's secret and proprietary information without Main Street's consent and without compensating Main Street for the information.

191. Upon information and belief, McBride and/or the Everest Defendants are benefiting from free use of information that Main Street developed at great cost.

192. As a direct and proximate result of Defendants McBride and the Everest Defendants misappropriation of secret, proprietary information Main Street has sustained and continues to sustain actual loss caused by misappropriation, including, but not limited to, loss of profits and revenues, loss of business relations with current customers/contracts, loss of business relations with future business prospects, and loss of competitive business advantage opportunity and/or expectancy.

193. As a direct and proximate result of Defendants McBride and the Everest Defendants' misappropriation of secret, proprietary information, Defendants have been unjustly enriched as a result of their misappropriation.

194. Unless these Defendants are immediately and permanently enjoined from misappropriating Main Street's secret, proprietary information, Main Street will continue to suffer immediate and irreparable harm through loss of valuable goodwill, contracts,

clients, prospective clients, prospective leads, prospective business prospects, and competitive business advantage opportunity, and/or expectancy.

195. Defendants McBride and the Everest Defendants acted with the intent to injure, defraud, and/or deliberately interfere with the rights of Main Street.

196. Defendants McBride and the Everest Defendants conduct constitutes aggravated and outrageous conduct and acting with an evil mind.

197. Plaintiff has no adequate remedy at law for erosion of its customer base, loss of Diverted Brokers, and diversion of its business opportunities that will result from Defendants' use of its copyright protected software, Trade Secrets, and other proprietary information because in the insurance industry, customer loyalty once lost is not always recoverable. The monetary value of lost customer goodwill is also impossible to quantify.

198. Plaintiff has no adequate remedy at law for future lost business opportunities because the number and value of these opportunities is impossible to quantify.

199. Main Street is entitled to injunctive relief; an award of damages for losses caused by the misappropriation of secret, proprietary information; an award of damages for unjust enrichment caused by misappropriation; disgorgement of any profits that the Everest Defendants received in connection with this misappropriation; and an award of punitive damages because willful and malicious misappropriation exists.

200. Plaintiff incorporates the allegations above as though fully stated herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants as follows:

**A.** Preliminary and permanent injunction binding on all Defendants; their officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with Defendants and/or their officers, agents, servants, employees, and attorneys:

**1.** Ordering them to preserve all evidence related to this action and restraining and enjoining them from deleting, destroying, or otherwise

modifying any form of evidence, electronic or otherwise, that may be relevant to the subject matter of this action;

**2.** Ordering them to return and refrain from using any and all documents and things that belong to Plaintiff;

**3.** Ordering them to return and refrain from using any and all electronic storage devices and digital computing devices that belong to Plaintiff, including but not limited to laptop computers, desktop computers, electronic tablets, electronic notebooks, cellular telephones, USB "thumb drives," and external hard drives;

**4.** Ordering them to submit to a third-party, computer forensic vendor any and all electronic storage devices and digital computing devices containing information belonging to Plaintiff, including but not limited to laptop computers, desktop computers, electronic tablets, electronic notebooks, cellular telephones, USB "thumb drives," and external hard drives, for review and deletion of information belonging to Plaintiff;

**5.** Ordering them to provide a third-party, computer forensic vendor access to any and all "cloud" accounts to which they have access and to disclose login, password, and any other information required to access to those accounts and to edit their contents, for review and deletion of information belonging to Plaintiff;

**6.** Ordering them to disclose all email accounts to which they have access and disclose login, password, and any other information required to access to those accounts and to edit their contents;

**7.** Ordering them to turn over all physical property of any form that they received or took from Plaintiff, including but not limited to laptop computers, desktop computers, electronic tablets, electronic notebooks, cellular telephones, USB "thumb drives," external hard drives, paper records, and any other physical property that belongs or ever belonged to

the Plaintiff that is in their possession, custody, or control;

**8.** Ordering them to return any and all information in physical, electronic, or any other form that they received or took from Plaintiff, including but not limited to Plaintiff's copyright protected code, Trade Secrets, Confidential Information, intellectual property, client information, prospective client information, customer information, programs, records, files, emails, strategic growth plans, and any other information in their possession, custody, or control that is or ever has been Plaintiff's property;

**9.** Ordering them so submit to documentation and deletion by a third-party, computer forensic vendor of any and all information in electronic form that Defendants received or took from Plaintiff, including but not limited to Plaintiff's copyright protected code, Trade Secrets, Confidential Information, intellectual property, client information, prospective client information, customer information, programs, records, files, emails, strategic growth plans and any other information in their possession, custody, or control that is or ever has been Plaintiff's property;

**10.** Restraining and enjoining them from retaining, making use of, disclosing, or communicating to any other persons Plaintiff's Trade Secrets, Confidential Information, intellectual property, patient medical and financial information, programs, records, files, emails, strategic growth plans and any other information in their possession, custody, or control that is or ever has been Plaintiff's property.

**B.** Preliminary and permanent injunction binding on the Everest Defendants and McBride, and all others in active concert with them:

**1.** Restraining and enjoining them from using, making use of, disclosing, or communicating to any other persons Plaintiff's Trade Secrets, Confidential Information, intellectual property, client information,

prospective client information, customer information, programs, records, files, emails, strategic growth plans, and any other information in their possession, custody, or control that is or ever has been Plaintiff's property.

**2.** Enjoining them from retaining electronic or physical media used to store Plaintiff's copyright protected code, Trade Secrets, Confidential Information, intellectual property, client information, prospective client information, customer information, programs, records, files, emails, strategic growth plans, and any other information in their possession, custody, or control that is or ever has been Plaintiff's property, including but limited to flash drives, USB drives, spreadsheets, strategic plans, client information, prospective client information, customer information, programs, records, files, emails, and other documents and/or things that are the property of Plaintiff.

**3.** Ordering them to return, delete, and keep no copies of Plaintiff's copyright protected code, Trade Secrets, Confidential Information, intellectual property, client information, prospective client information, customer information, programs, records, files, emails, strategic growth plans, and any other information in electronic, physical, or any other form in their possession, custody, or control that is or ever has been Plaintiff's property.

**C.** An award of reasonable attorneys' fees pursuant to Civ. Code § 3426.4 and 18 U.S.C. § 1836, and any other bases for recovery of attorneys' fees; and

**D.** Such other and further relief as this Court deems just and proper.

/ / /

/ / /

DATED this 16th day of January 2024.

RUSING LOPEZ & LIZARDI, P.L.L.C.

*/s/ Jonathan M. Saffer*
Jonathan M. Saffer
*Attorney for Plaintiff*